# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **PAUL JOHNSON,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  07-1033  (JDB)** |
| **DISTRICT OF COLUMBIA, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

Plaintiff Paul Johnson, an accountant at the University of the District of Columbia ("UDC"), brings this action against defendants District of Columbia, Mayor Adrian Fenty, and the UDC Board of Trustees (collectively "the District"), alleging discrimination on the basis of gender, age, and disability, and subsequent retaliation, in violation of federal anti-discrimination laws and the D.C. Human Rights Act.  Before the Court is the District's motion to dismiss the second amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted .[1]  For the reasons stated herein, the Court will grant in part and deny in part the motion to dismiss.  Johnson may pursue his claims of disability discrimination and retaliation for which he satisfied the requirement to timely exhaust administrative remedies and also his claim under the Equal Pay Act.  All other claims will be dismissed.

---

[1]  For ease of reference, the memorandum in support of defendants' most recent motion to dismiss and their reply brief will be cited as "Defs.' Mem.," and "Defs.' Reply," respectively. Johnson's opposition brief will be cited as "Pl.'s Opp."

## BACKGROUND[2]

Johnson is a 66 year old male who is blind in one eye and has insulin-dependant diabetes, a condition that affects his vision, metabolism, and sleep.  Second Am. Compl. ¶¶ 5, 59.  In particular, his condition causes him to work slowly and sporadically fall asleep during work, and also limits his ability to drive.  Id. ¶ 5.  He has worked for more than 17 years as an accountant for the UDC Finance Office, and is the oldest accountant there.  Id. ¶¶ 3-4, 6.  His section reports to the Controller, Lashahn Gaines, whom he describes as the primary source of the alleged discriminatory conduct.  Id. ¶¶ 7, 30-35.  He has consistently received "exceeds expectation" evaluations for his work despite his diabetes and accompanying limitations, yet is the lowest paid accountant in the Finance Office.  Id. ¶¶ 8-9.

In December, 2000, Johnson was asked to move from his position in the Cost Accounting area to the General Accounting area and assume the new title of Senior Accountant.  Id. ¶ 10.  As incentive he was promised a pay raise from his current salary of $44,000 to $58,000 and he accepted the position.  Id. ¶¶ 11-12.  However, the proposed pay increase never occurred.  Id. ¶ 13.  Furthermore, the position Johnson vacated was filled by a younger female who was paid a starting salary of $66,000, though performing the same duties and responsibilities he had performed.  Id. ¶ 14.  Unlike Johnson, she did not have a degree in accounting, and was less or, at best, only equally qualified for the position in comparison to Johnson.  Id.

On August 2, 2001, frustrated with his situation at work, Johnson complained to Keith Dukes, supervisor in the General Accounting office, and Earl Cabbell, Vice President of Finance and Administration, about the delay in his salary increase.  Id. ¶ 15.  He was assured that he

---

[2]    The Court assumes that the factual allegations of the second amended complaint are true for the purpose of ruling on the present motion.

would be compensated "at a rate commensurate with his experience and in line with his peers," but in the ensuing years, the pay raise he anticipated remained unfulfilled.  Id.

A year later, he began seeing reductions in his assignments. On June 26, 2002, during a department wide staff meeting, "close out" assignments were given to all accountants in the department except for Johnson, and his area of responsibility was reassigned to a consultant who made substantially more than him.  Id. ¶¶ 16, 18.  When Johnson made an inquiry into the reassignment of duties, he was told he was "out of order."  Id. ¶ 16.  The next month, on July 8, 2002, Johnson sent an internal letter of complaint to Keith Dukes entitled "Official Complaint of Unfair Employment Practices and Hostile Work Environment."  Id. ¶ 17.  Johnson believes that, in retaliation, his duties were further reduced and he was denied bonuses.  Id. ¶¶ 18, 122.  Key software was also removed from his computer, forcing him to stay late to use another employee's computer.  Id. ¶ 19.  When new computers were provided to his department, his was the last to be replaced.  Id. ¶ 20.

On October 2, 2002, he hired an attorney who submitted a letter to Earl Cabbell regarding "unfair pay practices."  Id. ¶ 21.  Cabbell did not respond.  Id.  A year later, on October 1, 2003, Johnson's pay was increased to $54,477 as part of an across the board salary increase for everyone in the department, but falling short of the $58,000 pay increase he was promised and hence, in his view, leaving the alleged overall pay inequity unremedied.[3]  Id. ¶ 23.

About seven months later, in May 2004, Johnson was promised a "desk audit" by his departmental supervisor (Gaines), but the audit was delayed for "a number of months."  Id. ¶¶ 24-

---

[3]  On the same date, Johnson received a retroactive adjustment in his pay, increasing his salary from $45,667 to $47,429 retroactive to September 2000.  Second Am. Compl. ¶ 22.  Johnson contends that this, too, was a salary increase given to all staff, which did not remedy the pay inequity.  Id.

25.  Based on feedback he received from the delayed audit, Johnson wrote another letter of complaint to Keith Dukes on September 9, 2004, alleging discrimination based on age, gender, and sexual orientation.  Id. ¶ 25.

Johnson was told that same month that he would be promoted to Senior Accountant following approval in a document referred to as "Form 1."  Id. ¶ 26.  On or about October 25, 2004, Johnson asked his Human Resources office about the status of Form 1, and was told that it had been approved on September 16, 2004, and forwarded to Gaines for her signature but had not yet been signed.  Id.  Johnson made further inquiries into the reason for the delay, and was told by Dukes that Gaines "did not want Mr. Johnson as a member of her team" and had made other negative comments about him.  Id.  The next month, Johnson asked Gaines at a staff "mini closeout meeting" when she planned to address his pay and title situation.  Id. ¶ 27.  She responded that he was "out of order" and criticized him for "disrupting her meeting."  Id. He again heard from co-workers soon thereafter that Gaines did not want him "on the team" and hoped to humiliate him so that he would retire.  Id.

Johnson alleges that Gaines acted abusively toward him in numerous ways.  She constantly ridiculed him about sleeping at his desk and working slowly.  Id. ¶ 31.  She excluded him from assignments, awards, and other acknowledgments, and asked colleagues to document his alleged lack of timeliness, productivity, and sleep habits.  Id. ¶ 33.  She also made him work nights, which created more problems for his vision.  Id. ¶ 34.

Johnson ultimately received the Form 1 on February 22, 2005, but it changed only his title, not his pay.  Id.  In early 2005 when he spoke with Gaines about his salary she told him that she could no longer help him now that he had a lawyer.  Id. ¶ 35.

On July 11, 2005 Johnson filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") and was granted a right to sue letter on March 14, 2007. Id. ¶ 2. He then filed this lawsuit seeking lost wages, retirement benefits, and compensatory and punitive damages. Id. ¶ 151. Counts One and Ten allege that he received less pay than similarly situated females because of his gender, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq., and the Equal Pay Act, 29 U.S.C. § 206(d), and rests on his alleged replacement in 2001 by a younger female performing the same duties at a higher salary and the allegedly inequitable office-wide salary raise in 2003. Count Three alleges that he received less pay than similarly situated younger employees because of his age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq., again supported by the alleged replacement in 2001. Counts Two, Four, Six, Seven, and Nine allege discrimination and hostile work environment based on actual or perceived disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. §§ 701 et seq., and includes among the discriminatory acts his lower salary compared to similarly situated non-disabled employees, reduction of assignments, and degrading and humiliating remarks by supervisors in front of his peers. Count Eight alleges retaliation based on his internal complaints about the alleged disparate pay and abusive treatment, and specifies the denial of assignments, bonuses, and assistance in obtaining the sought-after pay raise. In addition, in Count Five Johnson brings parallel claims of discrimination based on sex, age, and disability under the D.C. Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 et seq.

## STANDARD OF REVIEW

All that the Federal Rules of Civil Procedure require of a complaint is that it contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. ___, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); accord Erickson v. Pardus, 551 U.S. ___, 127 S. Ct. 2197, 2200 (2007) (per curiam). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Bell Atl. Corp., 127 S. Ct. at 1964-65; see also Papasan v. Allain, 478 U.S. 265, 286 (1986). Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp., 127 S. Ct. at 1965 (citations omitted). However, a court "must not make any judgment about the probability of the plaintiff's success, for a complaint 'may proceed even if it appears that a recovery is very remote and unlikely'" or that the plaintiff "will fail to find evidentiary support for his allegations." Aktieselskabet AF 21. November 21 v. Fame Jeans, Inc., 525 F.3d 8, 17 (D.C. Cir. 2008).

The notice pleading rules are not meant to impose a great burden on a plaintiff. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005); see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512-13 (2002). When the sufficiency of a complaint is challenged by a motion to dismiss under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should be liberally construed in his or her favor. Leatherman v. Tarrant County Narcotics & Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968

(D.C. Cir. 1979); see also Erickson, 127 S. Ct. at 2200 (citing Bell Atl. Corp., 127 S. Ct. at 1965)). The plaintiff must be given every favorable inference that may be drawn from the allegations of fact. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). However, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." Kowal v. MCI Commc'n Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nor does the court accept "legal conclusions cast in the form of factual allegations." Aktieselskabet AF 21. November 21, 525 F.3d at 17 n.4; see also Domen v. Nat'l Rehab. Hosp., 925 F. Supp. 830, 837 (D.D.C. 1996) (citing Papasan, 478 U.S. at 286).

## DISCUSSION

### I.    Time-Barred Claims

Johnson alleges in his complaint that he has exhausted administrative remedies by filing a charge of discrimination against the District with the EEOC on July 11, 2005. Second Am. Compl. ¶ 2. The District responds that Johnson has nonetheless failed to timely exhaust administrative remedies for his allegations of discrimination and retaliation because the relevant events took place from 2000 to 2002. Defs.' Mem. at 15-20. The statutory scheme of Title VII requires a plaintiff to timely exhaust his or her administrative remedies before a civil action may be filed in federal court. Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997). To do so, an aggrieved party must file a charge with the EEOC alleging that the employer has engaged in an unlawful employment practice. To be timely, the employee must file an administrative charge with the EEOC within 180 days "after the alleged unlawful employment practice occurred," or 300 days if proceedings have been instituted at the state or local level. 42 U.S.C.

§ 2000e-5(e)(1); Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. ---, 127 S. Ct. 2162,

2166 (2007). This requirement also applies to claims brought under the ADEA, ADA, and

Rehabilitation Act and to retaliation claims raised under those provisions.  See Washington v.

Washington Metro. Area Transit Auth., 160 F.3d 750, 752 (D.C. Cir. 1998) (explaining that the

exhaustion requirement applies to claims under the ADEA); Long v. Howard Univ., 512 F. Supp.

2d 1, 12 n.6 (D.D.C. 2007) (discussing exhaustion requirement under the ADA and

Rehabilitation Act); Prince v. Rice, 453 F. Supp. 2d 14, 23 (D.D.C. 2006) (explaining that

exhaustion requirement applies to retaliation claims).

 However, "filing a timely charge of discrimination with the EEOC is not a jurisdictional

prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject

to waiver, estoppel, and equitable tolling."  Zipes v. Trans World Airlines, Inc., 455 U.S. 385,

393 (1982); Brown v. Marsh, 777 F.2d 8, 14 (D.C. Cir. 1985).  Under the doctrine of equitable

estoppel, a defendant cannot assert untimeliness where the defendant has taken active steps to

prevent the plaintiff from litigating in time.  Smith-Haynie v. Dist. of Columbia, 155 F.3d 575,

580 (D.C. Cir. 1998).  Hence, a case will not be dismissed for failure to exhaust administrative

remedies where "affirmative misconduct on the part of a defendant lulled the plaintiff into

inaction."  Baldwin County Welcome Center v. Brown, 466 U.S. 147, 151 (1984).

 Johnson alleges that he filed an official charge of discrimination on July 11, 2005.

Second Am. Compl. ¶ 2.  Therefore, Johnson's claims of discrete discriminatory or retaliatory

acts must have occurred in the 180 day period prior to July 11, 2005 -- that is, after January 11,

2005 -- for them to be included in a federal action before this Court.  See Nat'l R.R. Passenger

Corp. v. Morgan, 536 U.S. 101, 122 (2002); Prince, 453 F. Supp. 2d at 24.  Only two of the

alleged discriminatory events fall within the 180 day window:  first, the alleged discriminatory

denial of a salary increase on February 22, 2005 when "Form 1" was issued to Johnson, and

second, Gaines' refusal to help Johnson with his disparate pay situation after his retention of a

lawyer in early 2005.  The remaining alleged incidents fall outside the limitations period and can

only be considered here if equitable estoppel is appropriate.

Johnson argues that equitable estoppel saves his earlier claims from preclusion --

focusing on the events in 2001 and 2002 -- because his delay in initiating the administrative

process was due to reliance on his supervisors' assurance in 2001 that they would remedy the

disparity in pay.  Pl.'s Opp'n at 13.  Estoppel based on a defendant's conduct is applicable,

however, only if the defendant engaged in "affirmative misconduct" to lull a plaintiff into

inaction.  See Washington, 160 F.3d at 753.  But, in Johnson's own words, his supervisor only

"assured [him] that he would be compensated at a rate commensurate with his experience and in

line with his peers."  Second Am. Compl. ¶ 15.  This was not an explicit commitment to grant the

promised raise and should not have dissuaded him from pursuing administrative recourse

considering the absence of a commitment to provide any specific remedy.  Furthermore, even if

his supervisors' assurance could be construed as a commitment to resolve his grievance

informally, an employer's attempt to resolve a dispute raised by an employee does not rise to the

level of "affirmative misconduct."  See, e.g., Cristwell v. Veneman, 224 F. Supp. 2d 54, 60

(D.D.C. 2002) (holding that "participation in [a] settlement process" cannot by itself constitute

"affirmative misconduct").

Johnson's retention of an attorney in October 2002 further indicates that he was not lulled

into inaction by his supervisor's comment.  See Second Am. Compl. ¶ 21.  As he describes it,

UDC provided no response whatsoever to his attorney's letter complaining of unfair pay.  Id.

Where an employee is represented by counsel and nonetheless fails to pursue exhaustion of

administrative remedies, such lack of reasonable diligence weighs heavily against a finding of equitable estoppel. See Washington, 160 F.3d at 753 (rejecting application of equitable estoppel as an extraordinary remedy that had no applicability where plaintiff retained counsel but failed to timely exhaust administrative remedies). Considering the wholesale absence of any affirmative misconduct and Johnson's lack of reasonable diligence, the Court concludes that equitable estoppel has no application here.

Johnson also suggests that the doctrine of continuing violation makes his pre-2005 claims nonetheless timely. See Pl.'s Opp'n at 14; Second Am. Compl. ¶¶ 45, 56, 70, 83, 94, 105, 117, 126, 149 (alleging under each count that the conduct constituted a "continuing violation"). However, the Supreme Court has held that an assertion that discrete acts constitute a "continuing violation" or a series of related violations will not save a claim that falls outside of the limitations period. Morgan, 536 U.S. at 122; see also Prince, 453 F. Supp. 2d at 23-24. Accordingly, Johnson's recitation of a "continuing violation" in his complaint is of no moment. The 180-day limitations period applies with full force to his claims of discrete acts of discrimination.

Johnson's distinct claim alleging a hostile work environment must, of course, be analyzed separately. The Supreme Court has distinguished a claim regarding hostile work environment from discrete acts of discrimination: "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.' . . . Provided that an act contributing to the claim occurs within the filing period, the entire period of the hostile environment may be considered by a court for the purposes of determining liability." Morgan, 536 U.S. at 117. Here, the issuance of the Form 1 denying his requested pay raise and Gaines' refusal to assist him further on the matter occurred on February 22, 2005 or thereafter, and his EEO complaint was filed on July 11, 2005, thus bringing at least

two of the events contributing to the alleged hostile work environment within the 180-day limitation period. Thus, Johnson has sufficiently alleged that he timely exhausted his administrative remedies as to this claim.

The Court pauses here to clarify how this ruling impacts the case. According to Johnson's complaint, the first incident of disparate pay based on gender, age and disability occurred in the 2000-2001 period upon his transfer from Cost Accounting to General Accounting without a salary increase to $58,000 and the filling of his former position by a younger female at a higher salary, and then was repeated in the allegedly inequitable office-wide salary increase in October 2003. These events provide the basis of his gender and age disparate pay claims in Counts One and Three (see Second Am. Compl. ¶¶ 41-42, 66-67, 145), and those counts are dismissed in full. Those events appear to be part -- but not all -- of his disability discrimination claims as well, and to that extent Counts Two, Four, Six and Seven also are dismissed. Johnson also enumerates a series of actions taken by UDC from 2001 through 2004 -- that is, exclusion from assignments, reduction of duties, computer difficulties, denial of bonuses, and a delayed desk audit. See Second Am. Compl. ¶¶ 16-27, 122. To the extent his disability discrimination and retaliation claims rest on those allegations, those claims also are dismissed.

This leaves intact, however, Johnson's claim that the denial of a pay raise in the Form 1 mailed in February 2005 amounts to discrimination on the basis of actual or perceived disability and thus Counts Two, Four, Six, and Seven survive in this respect. His claim of retaliation based on Gaines' refusal to assist him further in the pay raise matter in 2005 (Count Eight) and the hostile work environment claim based on actual or perceived disability (Count Nine) also are not time-barred. The DCHRA and Equal Pay Act claims are not subject to the exhaustion

requirement and thus are unaffected by this assessment. The Court now turns to the District's remaining arguments for dismissing these claims.

## II.    Disability Discrimination

### A. Disparate Treatment -- Discriminatory Pay

Aside from certain variations in substantive coverage that are not relevant here, the ADA and the Rehabilitation Act provide disabled individuals with essentially identical protections against employment discrimination. See Harrison v. Rubin, 174 F.3d 249, 253 (D.C. Cir. 1999) ("Claims and defenses under the two statutes are virtually identical."). The ADA prohibits certain employers from discriminating against "a qualified individual with a disability" with "regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability" may be discriminated against by a program receiving federal financial assistance "solely by reason of her or his disability." 29 U.S.C. § 794(a). Claims of employment discrimination under these statutes generally can be scrutinized together given the coextensive scope of their coverage.[4] Harrison, 174 F.3d at 253.

To sustain a claim under the ADA and the Rehabilitation Act, Johnson must allege that he: (1) is disabled within the meaning of the statute, (2) was "qualified" for the position with or without a reasonable accommodation, and (3) suffered an adverse employment action because of his disability. Duncan v. Washington Metro. Area Transit Auth., 240 F.3d 1110, 1114 (D.C. Cir.

---

[4] Cases interpreting either statute are applicable in defining the term "disability" and otherwise determining liability. See 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the [ADA]."); see also Aka v. Washington Hosp. Ctr., 116 F.3d 876, 886 (D.C. Cir. 1997) (en banc) (recognizing that liability standards in the Rehabilitation Act and ADA are "fundamentally similar").

2001) (en banc) (quoting Swanks v. Washington Metro. Area Transit Auth., 179 F.3d 929, 934 (D.C. Cir. 1999)).  The District moves to dismiss the disability discrimination claims on the ground that Johnson is not disabled within the meaning of the statutes and that he did not suffer an "adverse employment action."[5]  The Court addresses each of these issues below.

### 1.      Definition of Disability -- Major Life Activity

An individual is disabled if he: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such impairment; or (3) has been regarded as having such an impairment.  29 U.S.C. § 705(20)(B)(I); Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 193 (2002); Haynes v. Williams, 392 F.3d 478, 481-82 (D.C. Cir. 2004).  All three disability definitions thus refer to a "substantial limitation on a major life activity."  Adams v. Rice, 531 F.3d 936, 943 (D.C. Cir. 2008).  In other words, the plaintiff "must show that [his] alleged impairment is, was, or was believed to be one that 'substantially limits one or more . . . major life activities.'"  Id.  Whether a person is disabled is an individualized inquiry, and a mere diagnosis of a disease does not mean that a person is disabled.  Sutton v. United Air Lines, Inc., 527 U.S. 471, 483-84 (1999); see also Toyota, 534 U.S. at 195, 198 ("merely having an impairment does not make one disabled for purposes of the [Act]").

---

[5] Under the ADA a "qualified individual" is someone who can, with or without reasonable accommodations, perform the essential functions of the position held.  42 U.S.C. § 12111(8); Weigert v. Georgetown Univ., 120 F. Supp. 2d 1, 6 (D.D.C. 2000).  Johnson's complaint alleges that he can perform the essential functions of his position, and the District does not dispute the adequacy of the complaint in this regard.

Johnson's complaint sufficiently alleges impairment as well as major life activities that are affected. He alleges that he is blind in one eye and suffers from diabetes. Second Am. Compl. ¶ 5. Both partial blindness and diabetes are impairments. 28 C.F.R. § 41.31(b)(1); 45 C.F.R. § 84.3(j)(2)(I). Johnson further alleges that these impairments limit his ability to see and sleep -- activities that are now established as major life activities.[6] See Toyota, 534 U.S. at 197 (holding that seeing is a major life activity); Desmond v. Mukasey, 530 F.3d 944, 953-55 (D.C. Cir. 2008) (holding that sleeping is a major life activity). The only real dispute, then, is whether he has adequately alleged that the limitations are "substantial."

The EEOC regulations define "substantially limits" as "(I) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). According to the Supreme Court, "substantially in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'" Toyota, 534 U.S. at 196. Factors in determining whether an impairment substantially limits a major life activity include the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact resulting from the impairment. Desmond, 530 F.3d at 956 (citing 29 C.F.R. § 1630.2(j)(2) and Toyota, 534 U.S. at 198). The substantial limitation standard requires an

---

[6]  Johnson also alleges that driving, working, and "metabolism" are major life activities in which he is substantially limited. This Circuit has not resolved those questions, see Desmond, 530 F.3d at 961 and Bell v. Gonzales, 398 F. Supp. 2d 78, 86 n.10 (D.D.C. 2005), and the Court finds it unnecessary to do so here.

individualized assessment, and the corrective or mitigating effects of medication and other devices must be taken into account.  Desmond, 530 F.3d at 955.

The complaint sufficiently alleges that Johnson's partial blindness and diabetes substantially limit his ability to see.  He is entirely blind in one eye, and has strained vision in his remaining eye due to his diabetes; this causes him to work slowly, to a degree that he has been subject to constant ridicule and productivity reviews.  See Second Am. Compl. ¶¶ 5, 31-33.   The Court further infers from these allegations that the blindness in one eye is permanent and severe. It bears mentioning that partial blindness may not always establish a substantial limitation on the major life activity of seeing.  See Rivera v. Apple Industrial Corp., 148 F. Supp. 2d 202 (E.D.N.Y. 2001) (holding that a security guard's inability to see out of one eye did not meet the ADA definition of disability because he failed to show that it substantially limited the major life activity of seeing).  However, Johnson has alleged more than simply that he is blind in one eye. The Court is also mindful that the Supreme Court has observed that "people with monocular vision 'ordinarily' will meet the Act's definition of disability," although cautioning that such persons must ultimately "prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial." Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 567 (1999).  Drawing all inferences in Johnson's favor, as the Court must do at this stage of the litigation, the Court concludes that he has adequately alleged that he is substantially limited in the major life activity of seeing.

With respect to sleeping, Johnson alleges that his diabetes "often causes him to fall asleep with little or no notice," that he "often falls asleep at his desk and sometimes in meetings, because of his diabetes," and that the problem is sufficiently severe that he is "constantly ridiculed" and co-workers have been asked to document whether or not he sleeps at his desk. See

Second Am. Compl. ¶¶ 5, 31-33.   Considering, once again, the liberal pleading standard at the motion to dismiss stage, the Court concludes that these factual allegations sufficiently allege that Johnson is substantially limited in the major life activity of sleeping.  See Desmond, 530 F.3d at 955 (observing that "needing a great deal of sleep may be as debilitating as getting too little").

### 2.  "Regarded As" Having a Disability -- Extent of Knowledge

The ADA and Rehabilitation Act provide that an individual is disabled if he is "regarded as" having an impairment that substantially limits a major life activity.  29 U.S.C. § 705(20)(B)(iii). Thus, an individual is covered by these statutes as disabled even if the employer "mistakenly believes that [the] person has a physical impairment that substantially limits one or more major life activities."  Sutton, 527 U.S. at 489.  Johnson pleads two counts, "in the alternative," based on being "regarded as" disabled -- Counts Six and Seven.  Second Am. Compl. ¶¶ 99, 112.  The District moves to dismiss these counts because the allegations fail to establish that it had knowledge of Johnson's partial blindness or diabetes, or of the limitations resulting from those conditions, and hence it could not have "regarded" Johnson as disabled.  See Defs.' Mem. at 8-9.

These arguments merit only brief discussion.  The complaint alleges that the District knew Johnson was blind in one eye and was diabetic -- a factual allegation that the Court must accept as true at this stage.  Second Am. Compl. ¶¶ 98, 111.  Furthermore, although those conditions are not necessarily readily apparent to co-workers, one can also reasonably infer that, considering Johnson's 17 years of employment with UDC's Finance Office, his supervisors became aware of these conditions.

The District believes that, even if it were aware of Johnson's impairments, the complaint still must be dismissed because the complaint does not establish the District's awareness of the

resulting limitations on Johnson's activities -- that is, seeing and sleeping.  Last month, this

Circuit rejected that proposition in Adams v. Rice, 531 F.3d at 950-52, and held that, in a case

alleging "regarded as" discrimination, "it makes no difference whether an employer has precise

knowledge of an employee's substantial limitation; . . . it is enough for the employer to know

about the impairment."  In other words, the Act prohibits an employer from discriminating

against, for example, an employee with cancer (as in Adams) -- or here, diabetes and partial

blindness -- if, in fact, the impairment substantially limits a major life activity, without regard to

whether the employer knew of the nature or extent of the substantial limitation.  See id. at 954.

The complaint's silence on the District's knowledge of the relationship between the impairment

and the limitations is thus of no moment.

> ### 3.    Adverse Employment Action

The District contends that, even if Johnson is "disabled," the disability claims nonetheless

must be dismissed because the alleged failure to provide the promised salary increase ($58,000)

was not an adverse employment action, pointing out that Johnson actually received two raises,

albeit not to the level he sought.  Defs.' Mem. at 6.   An adverse employment action requires that

there be "materially adverse consequences affecting the terms, conditions, or privileges of

employment or [] future employment opportunities such that a reasonable trier of fact could

conclude that the plaintiff has suffered objectively tangible harm."[7]  Stewart v. Evans, 275 F.3d

1126, 1134 (D.C. Cir. 2002) (quoting Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999));

---

[7]  The Court notes that many of the time-barred claims -- most notably, the computer difficulties,
the increased scrutiny he faced, and the changes in his assignments without reduction in pay --
would be dismissed as well because there were no materially adverse consequences that
amounted to objectively tangible harm.  See Forkkio v. Powell, 306 F.3d 1127, 1130-31 (D.C.
Cir. 2002) ("[P]urely subjective injuries, such as dissatisfaction with a reassignment or public
humiliation or loss of reputation, do not constitute adverse actions.") (internal citations omitted).

Mitchell v. Yates, 402 F. Supp. 2d 222, 229-30 (D.D.C. 2005).  "[C]ourts have consistently focused on ultimate employment decisions such as hiring, granting leave, promoting and compensating."  Dobbs v. Roche, 329 F. Supp. 2d 33, 42 (D.D.C. 2004).

The alleged failure to pay Johnson a salary increase based on his protected class status is well within the scope of an adverse employment action.  The District's presumption that only reductions in salary qualify as adverse employment action is in error.  See Defs.' Mem. at 6 ("plaintiff's pay has not been reduced").  As Johnson correctly points out, the prohibition against discrimination is not limited to actions which worsen already-existing conditions.  Pl.'s Opp'n at 9.  For example, the denial of a discretionary monetary bonus is an adverse employment action.  Russell v. Principi, 257 F.3d 815, 819 (D.C. Cir. 2001).  The lost opportunity to earn overtime pay also can be an adverse employment action because it may affect an employee's overall compensation package.  Bell, 398 F. Supp. 2d at 96-97.  For that same reason, the allegation that an employee did not receive an expected salary increase sufficiently alleges an adverse action -- that is, it affects his compensation.  See Keeley v. Small, 391 F. Supp. 2d 30, 45 (D.D.C. 2005).  Therefore, considering the tangible impact on Johnson's compensation the Court concludes that the District's alleged failure to grant an expected salary increase in the setting alleged here constitutes an adverse employment action.

**B.    Hostile Work Environment**

Employers may not create or condone a hostile or abusive work environment.  Such an environment exists "'[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21

(1993)); Singletary v. Dist. of Columbia, 351 F.3d 519, 526 (D.C. Cir. 2003). The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct rises to an actionable hostile work environment. Under Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998), in determining whether a work environment is sufficiently hostile to be actionable, a court should consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employee's performance.

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."

Id. at 787 (quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)); Clark County School Dist. v. Breeden, 532 U.S. 268, 271 (2001) ("simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient).

Johnson bases his claim of hostile work environment on a series of events dating from 2000 to about 2005 that allegedly targeted him because of his disabilities. Second Am. Compl. ¶¶ 129-37. He alleges that he has been ridiculed for being slow and sleeping at his desk, excluded from important assignments, and made to work nights. Id. ¶ 131. He alleges that Gaines did not want him "on the team" and hoped to humiliate him so that he would retire. Id. ¶ 27. Furthermore, he alleges that Gaines has made negative comments about him to other employees and degraded him by excluding him from awards and acknowledgments. Id. ¶¶ 32-33. All the while, he received less pay because of his disability. Id. ¶ 136.

Johnson's allegations of ridicule for sleeping too much and working slowly, and of other negative comments, do not sufficiently demonstrate a significant level of offensiveness. See,

e.g., Stewart, 275 F.3d at 1131, 1134-35 (use of term "idiot" and other profanities inadequate

where language was not pervasive); see also Bell, 398 F. Supp. 2d at 92 (holding that the

sporadic use of abusive language is insufficient to establish a hostile work environment).  Nor

can the denial of important assignments and working late be characterized as sufficiently

intimidating or offensive in an ordinary workplace context.  See Bell, 398 F. Supp. 2d at 92

("Occasional instances of less favorable treatment involving ordinary daily workplace decisions

are not sufficient to establish a hostile work environment.").  Furthermore, the alleged events are

temporally diffuse, spread out over a four-year period, suggesting a lack of pervasiveness.  See

Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996) (holding that occurrence

of alleged incidents intermittently over a seven-year period suggests the absence of a condition

sufficiently "pervasive" to establish liability).  As demonstrated by Johnson's "exceeds

expectation" evaluations, the alleged misconduct also has not interfered with his work

performance.  Second Am. Compl. ¶ 8.  Johnson, in effect, seeks to transform his disparate pay

issue into a hostile work environment claim by combining it with a series of ordinary workplace

difficulties.  But "mere reference to alleged disparate acts of discrimination against plaintiff

cannot be transformed, without more, into a hostile work environment." Childs-Pierce v. Utility

Workers Union of America,  383 F. Supp. 2d 60, 79 (D.D.C. 2005), aff'd 187 Fed. Appx. 1 (D.C.

Cir. 2006).  Assuming the truth of the alleged events and considering them in their totality,

Johnson has fallen far short of alleging conduct that, under Harris and Oncale, amounts to

"intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of

. . . employment and create an abusive working environment."  Accordingly, the Court will grant

the District's motion to dismiss Johnson's claim of hostile work environment in Count Nine.

### III.    Retaliation

Action taken against an employee in response to the employee's opposition to a forbidden practice may constitute unlawful retaliation. To establish a claim for retaliation the plaintiff must show: "(1) that he engaged in a statutorily protected activity; (2) that the employer took adverse personnel action; and (3) a causal connection existed between the two." Morgan v. Fed. Home Loan Mortgage Corp., 328 F.3d 647, 651 (D.C. Cir. 2003) (internal quotations and citations omitted); Brown, 199 F.3d at 452-53, 455.

The only part of Johnson's retaliation claim that is not time-barred is Gaines' alleged refusal in or about February 2005 to help in his pay raise matter, supposedly based on his retention of a lawyer. The Court thus considers the viability of his claim only with respect to this action. The District contends that Johnson's retention of a lawyer to protest the inaction on his pay raise is not "protected activity" because Johnson's "true reason" for doing so was that he was not provided the promised pay increase for accepting the Senior Accountant position, not that he was protesting discrimination. See Defs.' Mem. at 12. The District further argues that Johnson did not explicitly protest discrimination. Id. In response, Johnson highlights the content of his September 9, 2004 letter which includes clear allegations of discrimination based on age and gender. Pl.'s Opp'n at 12.

The Court need only refer to the complaint's description of that letter to conclude that Johnson engaged in protected activity, both in submitting the letter to his employer and then in retaining a lawyer. The complaint quotes that letter to his supervisor as stating:

> I am being ignored and discriminated against because of my age (63) and because of my gender . . . all of which, I am told, are protected classes under Title VII and the EEOC laws of the District of Columbia . . . . Moreover, I have been told that I am protected under the Americans with Disabilities Act . . . .

Second Am. Compl. ¶ 25.  This letter includes clear allegations of discrimination based on age, gender, and disability, and thus constitutes protected activity; furthermore, the retention of a lawyer in light of these allegations is also protected activity.  <u>Paquin v. Fed. Nat'l Mortgage Ass'n</u>, 119 F.3d 23, 31 (D.C. Cir. 1997) (holding that letters to employers protesting discrimination and retention of counsel are protected activity).

The District next argues, as it did concerning the disability discrimination claims, that Gaines' refusal to help Johnson cannot be considered an adverse employment action because there was no change in employment status or reduction in pay or benefits.  Defs.' Mem. at 13. An adverse employment action is necessary to sustain a claim of retaliation, just as it is for disparate treatment claims.  However, in the retaliation context, an employment action that is "materially adverse" is considered more broadly as one that is "likely" to "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  <u>Burlington Northern & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68, 70 (2006); <u>Ginger v. Dist. of Columbia</u>, 527 F.3d 1340, 1346 (D.C. Cir. 2008).  The threshold is lower than the standard for "adverse" action for discrimination claims (which requires a tangible impact on the terms, conditions or privileges of employment) because the statute is intended to provide broad protection to encourage disclosure of discrimination.  <u>White</u>, 548 U.S. at 63-67.  Applying this standard to the facts alleged here, the Court concludes that an employer's refusal to provide assistance in a pay raise matter would be likely to dissuade a reasonable worker from pursuing charges of discrimination relating to that matter.  Accordingly, the Court denies the District's motion to dismiss Count Eight.

## IV.    D.C. Human Rights Act

Johnson's complaint also alleges discrimination based on age, disability and gender in violation of the D.C. Human Rights Act.  Second Am. Compl. ¶ 90.  The District argues that the

DCHRA claim must be dismissed because Johnson failed to satisfy the mandatory notification requirement of the D.C. Code.  Defs.' Mem. at 20.  Section 12-309 of the D.C. Code provides:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage. D.C. Code § 12-309 (2005 ed.).

Compliance with the statutory notice requirement is mandatory and a prerequisite to filing a suit against the District of Columbia "because it represents a waiver of sovereign immunity." Winder v. Erste, No. 03-2623, 2005 WL 736639, at * 10 (D.D.C. 2005); Dist. of Columbia v. Arnold & Porter, 756 A.2d 427, 436 (D.C. 2000); Gwinn v. Dist. of Columbia, 434 A.2d 1376, 1378 (D.C. 1981).  The purpose of this provision is to "provide an early warning to District of Columbia officials regarding litigation likely to occur in the future."  Pitts v. Dist. of Columbia, 391 A.2d 803, 807 (D.C. 1978).

Johnson contends that he sent the District formal notice of his claims under the DCHRA on June 6, 2007.  Assuming arguendo that this notice was mailed to the Mayor,[8] it fails to satisfy the pre-suit notice requirement because it is untimely.  The most recent discriminatory action alleged occurred in February 2005 and the formal notice was sent over two years later. Therefore, Johnson's DCHRA claims under Count Five are dismissed for failure to comply with § 12-309.

---

[8] The District disputes whether Johnson mailed the notice to the Mayor, as required by § 12-309. See Defs.' Reply at 3 ("The undersigned counsel has made a diligent search and cannot locate any such notice.  Plaintiff has not produced a copy of his proper notice and evidently cannot do so.").

## V.    Equal Pay Act

"The Equal Pay Act prohibits payment of unequal wages for equal work on grounds of sex, unless the difference is justified by one of four enumerated defenses: a seniority system, a merit system, a system that measures pay by quality or quantity of production, or any other factor not based on sex." Thompson v. Sawyer, 678 F.2d 257, 263 (D.C. Cir. 1982); 29 U.S.C. § 206(d). Johnson alleges that based on his sex he was paid a lesser rate than other accountants performing the same duties, which required equal skill, effort and responsibility. Second Am. Compl. ¶¶ 147-48. The District seeks dismissal based on Johnson's alleged failure to "link his gender to his complaints about pay" until 2005 when he filed an EEOC complaint, but does not explain why that delay in notice warrants dismissal. See Defs.' Mem. at 15. Johnson suggests that the District is simply attacking his credibility -- that is, whether he genuinely believes the disparate pay is a gender issue -- and, considering the District's silence in its reply brief, that is the only interpretation the Court is able to discern. See Pl.'s Opp'n at 13. An argument that a plaintiff's factual allegations should not be credited is, of course, not a proper basis for dismissing the complaint. In any event, the District's contention that Johnson did not raise an issue of gender discrimination until July 2005 is refuted by the complaint, which describes Johnson's September 9, 2004 internal letter alleging discrimination based on gender, as well as a 2002 letter from his former counsel alleging "unfair pay practices." Second Am. Compl. ¶¶ 21, 24. Accordingly, the Court will deny the District's motion to dismiss the Equal Pay Act claim in Count Ten.

## VI.    Mayor Fenty as a Defendant

Johnson has sued Mayor Fenty in his official capacity only. See Pl.'s Opp'n at 15. The District seeks to dismiss the claims against the Mayor because a suit against a public official in

his official capacity is simply a suit against the governmental entity he represents – here, the District of Columbia. See Defs.' Reply at 6. The District is correct that a lawsuit against the Mayor acting in his official capacity is the same as a suit against the District. See, e.g., Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) ("suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office") (citing Brandon v. Holt, 469 U.S. 464 (1985)). However, even though retaining the Mayor as a party in the suit is redundant, "there is no requirement that, because of the equivalence, the public official defendant must be dismissed." Winder, 2005 WL 736639 at *5; Dominion CoGen, D.C., Inc. v. Dist. of Columbia, 878 F. Supp. 258, 264 n.5 (D.D.C. 1995). Accordingly, the Court denies the motion to dismiss the claims against the Mayor in his official capacity.

## CONCLUSION

The Court grants in part and denies in part the motion to dismiss as set forth above. The result of this ruling is that the only claims that remain pending are Johnson's claims alleging disability discrimination (Counts Two, Four, Six, and Seven) based on the February 2005 issuance of the Form 1 denying a pay raise; the retaliation claim concerning Gaines' refusal to provide assistance to Johnson thereafter in 2005 (Count Eight); and the claim under the Equal Pay Act (Count Ten). The claims in Johnson's second amended complaint are dismissed in all other respects. A separate order accompanies this memorandum opinion.

/s/
_____
JOHN D. BATES
United States District Judge

Dated:   August 21, 2008