**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| PAUL JOHNSON, | |
| Plaintiff, | |
| v. | Civil Action No. 07-1033 (JDB) |
| DISTRICT OF COLUMBIA, et al., | |
| Defendants. | |

## MEMORANDUM OPINION

Plaintiff Paul Johnson has brought this action against defendants District of Columbia, Mayor Vincent Gray,[1] and the University of the District of Columbia Board of Trustees[2] (collectively "the District") alleging discrimination on the basis of sex and disability, and subsequent retaliation, all in violation of federal anti-discrimination laws. The District, i.e., all three defendants, has filed a motion for summary judgment, and, for the reasons set forth below, the Court will grant that motion.

---

[1] Former Mayor Adrian Fenty was named in his official capacity as a defendant in Johnson's original complaint; however, Mayor Vincent Gray has since replaced Mayor Fenty in the Executive Office of the Mayor. "[F]ederal law provides for *automatic substitution* of the new officer when the originally named officer has been replaced." Cheney v. U.S. Dist. Court for D.C., 541 U.S. 913, 917 (2004) (citing Fed. R. Civ. P. 25(d)(1); Fed. R. App. P. 43(c)(2)). Nonetheless, because a lawsuit against the Mayor acting in his official capacity is the same as a lawsuit against the District, the Mayor's inclusion in this lawsuit is unnecessary because it is duplicative. See e.g., Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) ("suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office[,]" and as such, it is no different from a suit against the State itself) (internal citations omitted).

[2] The District argues that the University of the District of Columbia Board of Trustees "was not and is not Johnson's employer," and therefore should be dismissed from this action. P. & A. in Supp. of Summ. J. at 67-68. Johnson has not contested this point, which seems correct. However, because the Court is granting the motion for summary judgment dismissing this action in its entirety, the Court need not reach the question.

## BACKGROUND

Johnson has worked at the University of the District of Columbia ("UDC") Finance Office since 1990, when he began work as a Cost Accountant reconciling intra-District grants for payment. Pl.'s Stmt. of Material Facts [Dkt. 62-4] ¶ 1; Defs.' Ex. 1 (Johnson Dep.) [Dkt. 59-1] at 13:9-16, 38:6-19. Johnson is blind in one eye and has insulin-dependent diabetes. Johnson Dep. at 119:10-14; 127:13-14. Johnson occasionally falls into a brief diabetic sleep at his desk after lunch, and his eye feels strained if he works long hours into the evening. Id. at 102:7-22, 122:15-22.

In 2000, Alvin Cannon was the UDC Controller and worked directly under CFO Greg Davis. See Defs.' Ex. 4 (Dukes Dep.) [Dkt. 59-1] at 27:1-21. According to Johnson, in December 2000, Cannon asked Johnson to move from his position in the Cost Accounting department, where he worked as a Cost Accountant under Vivian Brown with a salary of $44,000,[3] to a position in the General Accounting department. See Johnson Dep. at 38:6-16, 75:2-76:3, 206:9-21; Defs.' Stmt. of Material Facts ¶ 10; 2d Am. Compl. ¶ 11. Of particular importance, Johnson alleges that Cannon orally promised him a promotion in job title to "Senior Accountant" and a pay raise from his current salary to $58,000.[4] See Johnson Dep. at 75:17-76:6. This alleged agreement was never memorialized in writing. Id. at 207:14-19. Johnson was subsequently transferred to the General Accounting department, where he was supervised by Keith Dukes, but Johnson did not receive the pay raise that was allegedly promised. Id. at 203:8-15; 206: 9-21; Dukes Dep. at 9:14-10:8. According to Brown, when Johnson left her department

---

[3] Johnson originally stated that, "[p]rior to transferring out of his prior position, [Johnson] was earning $44,000." Pl.'s 2d Am. Compl. ¶ 11. However, Johnson also testified that he received a pay raise from $48,590 to $50,465, effective September 1, 2000, which would have been prior to Johnson's move from Cost Accounting to General Accounting. See Johnson Dep. at 68:11-22. This raise may have been implemented at a later time and retroactive to September 1, 2000, but the timing is unclear from the record. See id. at 68:14-15, 69:3-14 (Johnson states that the pay raise was "retroactive, going back and making adjustments to our steps").
[4] In apparent contradiction to Johnson's own testimony about this alleged agreement, Johnson also testified that Cannon "demanded that I take a new position. In fact, I was physically moved to a new position in a new office space." Johnson Dep. at 75:2-76:3.

in December 2000, Johnson's former position was eliminated because that work "slot" transferred along with Johnson to General Accounting. Defs.' Ex. 5 (Brown Dep.) [Dkt 59-1] at 88:13-89:20.

Johnson, on the other hand, believes the Cost Accountant position that he vacated was filled by Ana Reyes, a female, who was paid $66,000. Johnson Dep. at 207:20-208:12. However, discovery revealed that Reyes was not affiliated with the UDC Finance Office until February 2001, when she joined a task force dispatched to the UDC Finance Office by the Office of Financial Operations and Systems ("OFOS"). See Defs.' Ex. 6 (Reyes Dep.) [Dkt. 59-1] at 15:4-7, 22:2-14, 54:16-55:8; Defs.' Ex. 3 (Bryon Dep.) [Dkt. 59-1] at 45:4-17; Dukes Dep. at 58:10-60:1; Pl.'s Ex. 6 (Reyes' Resume) [Dkt. 64]; Defs.' Ex. 7 (Reyes' Resume) [Dkt. 59-1]. At the time, the District of Columbia government was transferring to a new accounting system called SOAR, and this task force was assigned to help the UDC Finance Office with the transition. See Reyes Dep. at 9:5-21, 14:10-19:20, 30:9-32:10; Defs.' Ex. 3 (Byron Dep.) [Docket Entry 59-1] at 44:8-45:10. The title of Reyes's position on the task force was "Agency Group Accountant." Defs.' Ex. 7 (Reyes' Resume) at 3. As a member of the task force, Reyes was an employee of OFOS, and reported directly to another task force member, LaShawn Gaines. Reyes Dep. 54:16-55:8; Brown Dep. 95:2-5; Dukes Dep. at 58:16-59:4.

Around October 2001, Ms. Reyes was hired as a permanent employee by the UDC Finance Office. Reyes Dep. 23:1-6; 26:11-32:18. Reyes recalls that her job title was "Operating General Ledger Accountant," also referred to as "Operating Accountant," and believes her salary was $70,000. Id. at 23:12-25:1; Defs.' Ex. 7 (Reyes Resume) at 3. In this role, Reyes continued to report to Gaines, who had taken on the position of UDC Controller. Reyes Dep. at 41:10-13.

Cannon, the person who allegedly promised Johnson a promotion and raise, was terminated from his position as Controller when CFO Davis was replaced by an interim CFO,

Cassandra Alexander.  See Dukes Dep. 27:1-21; Pl.'s Ex. 5 (Cabbell Dep.) [Dkt. 70] at 19:23-20:6.  The exact date of Cannon's departure is unclear from the record, and there is no evidence that Johnson ever spoke with Cannon about the alleged promise again after December 2000.  However, according to Johnson, on August 2, 2001, he complained to Dukes, Johnson's supervisor in General Accounting, about the delay in Johnson's allegedly promised raise.  2d Am. Compl. ¶ 15.  Nearly a year later, on July 8, 2002, Johnson sent a memorandum to Dukes, outlining his concerns about not being promoted or paid more.  Pl.'s Ex. 12 (Jul. 8, 2002 Mem.) [Dkt. 75] at 9.  Dukes testified that Johnson told him that Cannon had promised Johnson a promotion and a raise, but Dukes stated that he was never informed of any plan to change Johnson's position or salary.  Dukes Dep. at 18:6-19:14.  On October 21, 2002, an attorney hired by Johnson wrote a letter on his behalf to Earl Cabbell,[5] a superior in the UDC Finance Office, regarding "an ongoing pay dispute," noting that "younger and less experienced personnel have come into the Finance Office at higher rates of pay for performing basically the same job functions."  Pl.'s Ex. 2 (Oct. 21, 2002 Letter) [Dkt. 68] at 1-2.

In November 2003, Johnson's pay was increased from $50,465 to $57,965, retroactively effective October 1, 2003, as part of a department-wide salary raise.  Johnson Dep. at 71:2-21, 72:9-17, 73:8-12.  The pay raise was based primarily on years of service.[6]  See id.; Defs.' Ex. 2 (Gaines Dep.) [Dkt. 59-1] at 31:15-18.

Around June 2004, Johnson received a desk audit, which is a process administered by the Human Resources department at the UDC Finance Office to determine whether an employee's

---

[5] In his October 21, 2002 letter, Johnson refers to Cabbell as the "Vice President of Finance and Administration," but Cabbell testified that "I was not and never was a VP of Finance at no time." Pls.' Ex. 5 (Cabbell Dep.) [Dkt. 70] at 17:7-8.  It is unclear from the record what position Cabbell held within the UDC Finance Office.
[6] At around this time in 2003, Reyes was also given a raise that increased her salary from $70,274 to $74,912.  See Defs.' Ex. 8 (Reyes Pay Harmonization Form) [Dkt. 59-1].  Reyes left the UDC Finance Office shortly thereafter, in January 2003, and has since been working for another organization.  See Reyes Dep. at 34:20-35:10; Defs.' Ex. 7 (Reyes Resume) at 1-3.

duties and responsibilities are commensurate with his position, grade, and salary. <u>See</u> Byron Dep. at 41:13-42:3. The desk audit was performed by Nelson Madison, and involved obtaining information from Johnson and Dukes about Johnson's current duties. <u>See</u> Dukes Dep. at 30:12-32:10; Byron Dep. at 41:13-21. The audit found that Johnson's pay was commensurate with his duties, but that his position should have the title of "Senior Accountant." <u>See</u> Bryon Dep. at 41:13-42:7. As a result of the desk audit, Johnson's title was formally changed to Senior Accountant sometime at the end of 2004 or in early 2005. <u>See</u> Bryon Dep. at 42:6-11; Pl.'s Ex. 1 (Jun. 6, 2011 Johnson Aff.) [Dkt. 67] ¶ 29.

Johnson wrote another letter of complaint to Dukes on September 9, 2004, alleging discrimination based on age, gender, disability, and sexual orientation. Pl.'s Ex. 12 (Sep. 9, 2004 Mem.) [Dkt. 75] at 8. Johnson then alleges that, in "early 2005," prior to filing a charge with the Equal Employment Opportunity Commission ("EEOC"), he told Gaines "about the fact that [a form] [Johnson] received . . . after the Desk Audit . . . changed only [his] title but not [his] pay and grade," and Gaines responded that "she would no longer help [Johnson] because [he] had an attorney and [he] was 'in legal.'" Pl.'s Ex. 1 (Jun. 6, 2011 Johnson Aff.) ¶ 29; <u>see also</u> 2d Am. Compl. ¶ 35. Gaines does not recall this conversation. <u>See</u> Gaines Dep. 53:13-21, 55:1-5.

On or around July 11, 2005, Johnson filed a charge of discrimination against the District with the EEOC, and was given a right to sue letter on March 14, 2007. 2d Am. Compl. ¶ 2. He then filed this lawsuit within 90 days thereafter. After the Court's earlier Opinions and Orders issued in response to a motion to dismiss in 2008 and a motion for reconsideration in 2009, the following claims remain intact: that Johnson received less pay than similarly situated females because of his gender, in violation of the Equal Pay Act, 29 U.S.C. § 206(d) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e <u>et seq.</u>; that Johnson received a lower salary compared to similarly situated non-disabled employees because of actual or perceived disability,

in violation of the Americans with Disability Act, 42 U.S.C. §§ 12101 et seq., and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq.; and that Johnson suffered retaliation when Gaines allegedly refused to help him with his pay claim after Johnson filed internal complaints concerning the alleged disparate pay and retained an attorney.  The District moved for summary judgment after the close of discovery.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1); see also Celotex, 477 U.S. at 323.

In determining whether there exists a genuine dispute of material fact sufficient to preclude summary judgment, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  Moreover, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-50 (citations omitted).  Summary judgment, then, is appropriate if the

non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

Recognizing the potential difficulty for a plaintiff in an employment discrimination or retaliation action to uncover clear proof of discriminatory or retaliatory intent, the district court approaches summary judgment in such actions with "special caution." Aka v. Washington Hosp. Ctr., 116 F.3d 876, 879-80 (D.C. Cir. 1997), vacated on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).   Nevertheless, the plaintiff is not relieved of his obligation to support his allegations with competent evidence.   Brown v. Mills, 674 F. Supp. 2d 182, 188 (D.D.C. 2009). "As in any context, where the plaintiff will bear the burden of proof at trial on a dispositive issue, at the summary judgment stage, he bears the burden of production to designate specific facts showing that there is a genuine dispute requiring trial." Mason v. Geithner, 811 F. Supp. 2d 128, 175 (D.D.C. 2011) (citing Ricci v. DeStafano, 557 U.S. 557 (2009)).   Absent this burden, the plaintiff could effectively defeat the "central purpose" of the summary judgment device, "which is to weed out those cases insufficiently meritorious to warrant . . . a jury trial," simply by offering conclusory allegations and speculation.   Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999).

## DISCUSSION

The District moves for summary judgment as to all of Johnson's claims.   For the reasons discussed below, the Court will grant the District's motion.

### I.       Unequal wages

The Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d)(1), makes it unlawful for an employer to "discriminate . . . on the basis of sex by paying wages to employees . . . at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which

are performed under similar working conditions[.]"  The plaintiff has the initial burden to prove

wage disparity and job equality.  Musgrove v. District of Columbia, 775 F. Supp. 2d 158, 165

(D.C. Cir. 2011) (citing Goodrich v. Int'l Bhd. of Elec. Workers, AFL-CIO, 815 F.2d 1519, 1523

(D.C. Cir. 1987)); see Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974).

To establish a prima facie violation of the EPA, a plaintiff must show by a preponderance

of the evidence that (1) he was doing "substantially equal work on a job, the performance of

which required substantially equal skill, effort, and responsibility as jobs held by members of the

opposite sex"; (2) "the job was performed under similar working conditions"; and (3) he was

"paid at a lower wage than members of the opposite sex doing equal work."  Musgrove, 775 F.

Supp. 2d at 165 (internal citations omitted).

Here, Johnson makes the following claims under the EPA: (A) that the District paid him

less than Reyes, who performed equal work in substantially the same position Johnson formerly

held and (B) that the District paid him less than other females performing the same work.

### A.    Unequal Pay Compared to Reyes

The record does not support Johnson's assertion that, after he left his Cost Accountant

position, the position was filled by a female (Reyes) who performed the same duties that Johnson

had performed.  Instead, the evidence shows that Reyes held completely different positions from

Johnson's former Cost Accountant position.[7]  In fact, despite claiming that Reyes took over his

former position, Johnson testified that he did not know what Reyes' actual position was, or what

duties and responsibilities she had in addition to any intra-District grant work.  See Johnson Dep.

207:20-211:11.

---

[7] As purported evidence of the similarities of the positions, Johnson points to a 1997 letter from the Office of the CFO of the District of Columbia offering Reyes an accountant position, and a description of an accountant position in the Office of the D.C. Controller, Office of Finance Management; however, he fails to demonstrate how this information is in any way relevant to Reyes' 2001 or 2003 positions at issue here.  See Pl.'s  Ex. 10 (Jul. 15, 1997 Offer Letter from the Office of the CFO of the District of Columbia to Reyes and an Accountant Position Description in the Office of the D.C. Controller, Office of Finance Management) [Dkt. 64] at 17, 18.

As a Cost Accountant, Johnson handled intra-District work, which involved "reconcil[ing]" the intra-District grants "for payment from other agencies," booking data into UDC's financial management system, and processing invoices for payment.[8]  See Johnson Dep. 38:6-39:8.  Although Reyes did handle some intra-District grant work, her positions involved additional and significantly different duties and responsibilities.  As an agency group accountant, Reyes' responsibilities included assisting with the transfer of the UDC Finance Office's accounting system to SOARS, running and analyzing the general ledger, and coordinating efforts with management concerning accounting system issues.  See Reyes Dep. 14:10-19:20; Brown Dep. 95:6-19, 203:12-205:11.  There is no evidence to suggest that Johnson was responsible for any of these tasks as a Cost Accountant.  Later, as an Operating Accountant, Reyes assisted with monthly and quarterly financial reviews of UDC and provided training and assistance on the SOARS accounting system, in addition to other duties.  See Reyes Dep. 26-11-32:18.  Again, there is no evidence in the record to show that Johnson was responsible for any of these tasks.  Furthermore, Cyril Byron, a former UDC CFO, testified that the Operating Accountant position is hierarchically above and "more difficult" than the Cost Accountant position.  See Bryon Dep. 49:10-50:19.

In regard to Reyes' involvement in SOARS-related functions, Johnson argues that work with SOARS is accounting work – implying that all types of accounting work are the same and therefore Reyes' SOARS-related work was similar to his work.  See Opp'n at 17.  However, whether Reyes performed accounting functions is not at issue; the issue is whether her functions as an Agency Group Accountant or as an Operating Accountant were "substantially equal work" requiring "substantially equal skill, effort, and responsibility . . . performed under similar

---

[8] Johnson alleges that he "did more than Intra-District reporting.  His work was key to closeout."  Opp'n at 16. However, he puts forward no evidence in support of these statements, or explains how such a distinction materially impacts this analysis.

working conditions." See Musgrove, 775 F. Supp. 2d at 165. The record demonstrates that both of Reyes' positions involved significantly different responsibilities and skills than Johnson's former Cost Accountant position. Indeed, in addition to having different job titles and duties, Johnson and Reyes also reported to different supervisors.[9] Accordingly, it is clear that Johnson fails to meet his burden of proving job equality, and hence his EPA claim in regard to Reyes does not survive summary judgment.

**B.      Unequal Pay Compared to Other Female Employees**

Johnson's other claim under the EPA is that the District paid him less than females who performed the same work with the same duties and responsibilities. Opp'n at 9, 12, 18. In support of this assertion, he offers a loss calculation report prepared by an economist at his request (the "Edelman Report"), which allegedly shows that "males are all lower paid than females in similar positions." Id. at 12; Pl.'s Ex. 11 (Edelman Report) [Dkt. 74] at 10. However, Johnson fails to point to any evidence to support the implication that the female employees listed in the report were performing "substantially equal work" or that their work "required substantially equal skill, effort, and responsibility" as his work. See Musgrove, 775 F. Supp. 2d at 165; see also Smith v. Janey, 664 F. Supp. 2d 1, 13 (D.D.C. 2009) (plaintiff's EPA claim failed when it did not include "a description of the skills and effort required for the plaintiff's and comparators' jobs, or [their] attendant responsibilities"). Instead, Johnson asserts, without any support, that the female workers whose names he provided to the economist for inclusion in the report: all held positions with the same job description as a Cost Accountant; all "worked in an office doing accounting work so [] they worked under similar conditions"; and "many" of them "reported to the same supervisors to whom [Johnson] reported." Opp'n at 16, 18.

---

[9] Reyes reported to LaShawn Gaines in both her former positions, and Johnson reported to Vivian Brown when he was a cost accountant and to Keith Dukes when he moved to General Accounting. See Reyes Dep. 41:7-13; Johnson Dep. 38:6-16, 75:2-76:3, 206:9-21, 209:1-6; Brown Dep. at 85: 17-20; Dukes Dep. at 8:9-9:16.

As part of the Edelman Report, Johnson submitted a note he wrote to the economist explaining that the data he provided was from a confidential wage report produced by the government which Johnson had entered into an excel chart. See Edelman Report at 10. He also writes in the note that he included "entries [only] … for individuals [who] worked at UDC under the UDC Controller who report[] to the UDC CFO – my co-workers." Id. However, there is no record evidence of these female employees' titles, job duties, or qualifications. Johnson's mere assurance that these female employees are "co-workers" is not enough to demonstrate that these female employees were proper comparators performing substantially similar work with equal skill, effort, and responsibility under similar working conditions. The Edelman Report, therefore, provides no evidence of Johnson's pay relative to female comparators and hence will be given no weight by the Court.

Excluding the report leaves only Johnson's self-serving testimony that he was paid less than female comparators, which alone is insufficient to survive a motion for summary judgment. Musgrove, 775 F. Supp. 2d at 170; see also Fields v. Office of Eddie Bernice Johnson, 520 F. Supp. 2d 101, 105 (D.D.C. 2007) ("Self-serving testimony does not create genuine issues of material fact."); Taylor v. FDIC, 132 F.3d 753, 762 (D.C. Cir. 1997) (noting that, on a motion for summary judgment, courts "examine the facts in the record and reasonable inferences in the light most favorable to the nonmoving party, but do not accept bare conclusory allegations as fact") (internal citations omitted). The Court finds that Johnson's "non-specific, conclusory assertion[s] . . . fall [] short of establishing by a preponderance of the evidence that, compared to his colleagues, the plaintiff was doing substantially equal work on a job, the performance of which required substantially equal skill, effort, and responsibility." Smith, 664 F. Supp. 2d at 13 (internal quotations omitted). "Such a lack of evidence . . . foredoom[s an] Equal Pay Act

claim." Id. (internal citations omitted).  Accordingly, the Court will grant the District's motion

for summary judgment with respect to Johnson's EPA claim.

## II.      Sex Discrimination

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.,

prohibits employers from discriminating against "any individual" with respect to sex.  Johnson

contends that the District violated the antidiscrimination provisions of Title VII when it denied

and delayed his promised pay raise.[10]

The Supreme Court established the familiar three-part "burden-shifting approach to

employment discrimination claims in cases where the plaintiff lacks direct evidence of

discrimination."  Chappell-Johnson v. Powell, 440 F.3d 484, 487 (D.C. Cir. 2006) (citing

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  However, the D.C. Circuit has

clarified that "[i]n a Title VII disparate treatment suit where an employee has suffered an adverse

employment action and an employer has asserted a legitimate, nondiscriminatory reason for the

decision, the district court need not – and should not – decide whether the plaintiff actually made

out a prima facie case under McDonnell Douglas."  Brady v. Office of the Sergeant at Arms, 520

F.3d 490, 494 (D.C. Cir. 2008).

Instead, once an adverse employment action is shown and a nondiscriminatory reason is

offered, the plaintiff has the ultimate burden of establishing that the reason provided by the

employer is pretext, and the Court "must determine whether all the evidence taken together is

insufficient to support a reasonable inference of discrimination."  Musgrove, 775 F. Supp. 2d at

169 (internal citations omitted).  "All of the evidence" means "any combination of (1) evidence

establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the

employer's proffered explanation for its actions; and (3) any further evidence of discrimination

---

[10] The Court initially dismissed this claim as time-barred; however, the Court reinstated the claim in its July 14, 2009 Order in light of the Ledbetter Fair Pay Act of 2009.  See Jul. 14, 2009 Mem. Op. [Dkt. 40].

that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer."  Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006); see also Washington v. Chao, 577 F. Supp. 2d 27, 39 (D.D.C. 2008) ("[I]n all instances where a defendant has asserted a legitimate, non-discriminatory reason for its conduct, the Court shall evaluate all of the evidence in the record, including that which would be used to establish a prima facie case (but not for the purpose of evaluating whether a prima facie case has been established), to address the ultimate question of discrimination vel non.").

This Court will, therefore, determine whether an adverse employment action has been demonstrated and whether a nondiscriminatory explanation has been offered, and, if so, whether Johnson has produced sufficient evidence for a reasonable jury to find that the District's asserted non-discriminatory explanation was mere pretext.

## A.   Adverse Action

Johnson argues that he suffered an adverse employment action because the District delayed and denied him a promised salary increase.[11]  Opp'n at 14.  An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  Douglas v. Preston, 559 F.3d 549, 552 (D.C. Cir. 2009) (internal citations

---

[11] Johnson also alleges that he suffered an adverse employment action in the form of a diminution in job duties, exclusion of closeout assignments, and denial of incentive awards.  See Opp'n at 13.  The District responds that these claims were dismissed as time-barred in the Court's August 21, 2008 Memorandum Opinion and Order, see Aug. 21, 2008 Mem. Op. [Dkt. 26] at 11, 17 n.7, and, furthermore, that Johnson's claim of denial of incentive awards was only pled as part of his retaliation claim, not as part of his gender discrimination claim.  See Defs.' Points & Auth. at 7-8.  The District is correct that these claims were dismissed when the Court dismissed the Title VII claim based on untimeliness; however, the Court reinstated the Title VII claim in its July 14, 2009 Order reflecting the Lilly Ledbetter Fair Pay Act's changes to the time restrictions on Title VII claims.  See Jul. 14, 2009 Mem. Op. [Dkt. 40] (citing Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5 (Jan. 29, 2009)).  Nonetheless, as noted in the Court's August 21, 2008 Memorandum Opinion, Johnson's alleged diminution in duties and exclusion of closeout assignments "were changes in assignments without reduction in pay … [which] would be dismissed as well because there were no materially adverse consequences that amounted to objectively tangible harm."  See Aug. 21, 2008 Mem. Op. [Dkt. 26] at 17 n.7; see also Forkkio v. Powell, 306 F.3d 1127, 1130-31 (D.C. Cir. 2002) ("[P]urely subjective injuries, such as dissatisfaction with a reassignment … do not constitute adverse action.") (internal citations omitted).

omitted).  The employee must "experience[ ] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002); see Griffin v. Wash. Convention Ctr.,142 F.3d 1308, 1310 (D.C. Cir. 1998) (termination is an adverse employment action); Cones v. Shalala,199 F.3d 512, 521 (D.C. Cir. 2000) (refusal to allow an employee to compete for a job could be actionable because it was "tantamount to refusing to promote him," and failure to promote can be an adverse employment action); Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003) ("[F]ormal criticism or poor performance evaluations are not [] adverse actions . . . if they did not affect the employee's grade or salary.").   "[N]ot everything that makes an employee unhappy is an actionable adverse action."  Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001).

The D.C. Circuit has not clearly ruled on whether the denial or delay of an allegedly promised salary increase is an adverse employment action.[12]  Generally, "hiring, firing, failing to promote, [and] reassignment with significantly different responsibilities . . . all relate to one's work responsibilities and position, and . . . it is obvious that each significantly changes an employee's status."  Douglas v. Donovan, 559 F.3d 549, 552 (D.C. Cir. 2009).  However, "[f]or employment actions that do not obviously result in a significant change in employment status … such as giving a poor performance evaluation [or] reassigning office space and equipment[,] … an employee must go the further step of demonstrating how the decision nonetheless caused such an objectively tangible harm."  Id. at 553.  "For example, a benefit such as a bonus – or, by logical extension, a pay raise – is objectively tangible because it has a 'direct, measurable, and

---

[12] Johnson argues that "denials of salary increases or raises" are adverse employment actions by citing to an Eight Circuit case.  See Opp'n at 13.  But that case actually contradicts Johnson's argument.  See Turner v. Gonzales, 421 F.3d 688, 696 (8th Cir. 2005) ("Similarly, a "decision not to raise . . . salary [is] not an adverse employment action [where] . . . salary [is] not decreased or otherwise diminished in any way.") (citing Tademe v. St. Cloud State Univ., 328 F.3d 982, 992 (8th Cir. 2003)).

immediate effect' upon the employee's compensation." Id. (citing Russell v. Principi, 257 F.3d 815, 818-19 (D.C. Cir. 2001)).  If a pay raise is considered objectively tangible, then by extension the denial or delay of a pay raise would be an objectively tangible harm.

Consequently, Johnson's claim that the District delayed and denied providing him with an allegedly promised pay raise arguably is an adverse employment action, if the claim is properly supported by the record.  However, the Court need not make this determination here because Johnson is unable to clear the additional hurdle of demonstrating that the District's asserted non-discriminatory explanation is pretextual.

### B.      Pretext

The District argues that Johnson did not receive a pay raise because his work did not merit one.[13]  In support of its position, the District offers evidence of Johnson's desk audit, which found that he was being paid commensurate with his duties and responsibilities. Furthermore, the District contends, if there is any pay disparity between Johnson and female employees, it results from "defendant's seniority system, legitimate merit system, system which measures earnings by quantity or quality of production and/or factors other than sex[.]"  See Am. Ans.; P. & A. in Supp. of Summ. J. at 2.  In support of this explanation, the District puts forward Reyes' work history and qualifications as reasons for her higher salary.  See P. & A. in Supp. of Summ. J. at 46-48.

Because the District has asserted a legitimate reason for its denial or delay of Johnson's raise, the Court must now determine whether he has "produced sufficient evidence for a

---

[13] The District also argues that the Comprehensive Merit Personnel Act ("CMPA"), D.C. Code § 1-601.01, et seq. is the exclusive remedy for Johnson's pay raise claim, and that this Court lacks jurisdiction over the instant complaint because Johnson has not alleged that he exhausted his administrative remedies, and "if [he] were to now file an appeal with the OEA, it would be dismissed as untimely[.]"  P. & A. in Supp. of Summ. J. at 21.  However, the CMPA does not apply to allegations of discrimination.  See Robinson v. District of Columbia, 748 A.2d 409, 411 (D.C. 2000) (noting that "an employee seeking relief for discrimination must pursue the remedies provided under the D.C. Human Rights Act rather than the CMPA").  Here, the D.C. Human Rights Act claims were dismissed, and the remaining claims of discrimination under the EPA, Title VII, the ADA, and the Rehabilitation Act are properly before this Court.

reasonable jury to find [this] reason was not the actual reason and that the employer intentionally discriminated against the plaintiff." Adeyemi v. D.C., 525 F.3d 1222, 1226 (D.C. Cir. 2008) (citing Brady, 520 F.3d at 493-95).  The plaintiff bears the burden of showing that a defendant's proffered non-discriminatory reason for the challenged action is a pretext. Musgrove, 775 F. Supp. 2d at 170 (internal citations omitted).   A plaintiff can carry this burden by showing that a non-discriminatory reason offered by a defendant is false, Montgomery v. Chao, 546 F.3d 703, 707 (D.C. Cir. 2008), or otherwise presenting enough evidence to allow a reasonable trier of fact to conclude that the employer's proffered explanation is pretext, Wicks v. Am. Transmission Co. LLC, 701 F. Supp. 2d 38, 45 (D.D.C. 2010) (citing Desmond v. Mukasey, 530 F.3d 944, 962 (D.C. Cir. 2008)).   Employees can also try to cast doubt on an employer's asserted reason by demonstrating the employer's failure to follow established procedures or criteria. Brady, 520 F.3d at 496 n.3. "If the employer's stated belief is reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." Id. at 495 (internal citations omitted).

Johnson does not argue that the desk audit of his duties was defective.[14]   Instead, he maintains that he was wrongfully denied a higher salary despite his good work record. Opp'n at 4.  But it was the desk audit that determined that there was no basis for increasing Johnson's

---

[14] He does argue that the desk audit was unnecessary "because CFO Alexander had already increased his job grade." Opp'n at 6.  In purported support of this argument, Johnson offers several documents.  The first is a September 2001 memorandum from CFO Cassandra Alexander stating that Johnson is reclassified as a senior accountant.  See Pl.'s Ex. 10 (Sep. 17, 2001 Alexander Memorandum) [Dkt. 64] at 5.  This document is followed by two others within Johnson's Exhibit 10, but it is unclear if they are connected to each other.  One document is a human resources form signed by Dukes and Alexander that does not include the name of the employee for whom the form is meant and lists two different Senior Accountant positions with different grades. See Pl.'s Ex. 10 (Request for Personnel Action Form) [Dkt. 64] at 6.  The other is a position description of what appears to be a Senior Accountant position for the Metropolitan Police Department, not the UDC Finance Office.  See Pl.'s Ex. 10 (Position Description) [Dkt. 64] at 7.  It is unclear how these documents support Johnson's belief that a desk audit was unnecessary when none of the documents appear to address his salary, which is the crux of his complaints.  Moreover, Johnson does not provide any evidence, through these documents or otherwise, to support an inference that the outcome of the desk audit was faulty or that it was tainted by discriminatory animus.

salary or grade, and there is no evidence that the circumstances surrounding the desk audit were questionable or tainted with discriminatory intent.

Johnson also tries to cast doubt on the District's non-discriminatory explanation by claiming that "Reyes was put in her position at UDC without a posting of the position." See Pl.'s Stmt. of Material Facts, ¶ 29. But Johnson presents insufficient evidence to demonstrate that there were "established procedures or criteria" that the District should have followed by posting available positions. He offers sections of the D.C. Code and Municipal Regulations that provide for "open competition[,]" which "involve[es] positive recruitment and . . . procedures designed to achieve maximum objectivity, reliability, and validity" for available positions; however, these regulations do not require that positions be publicly posted. Pl.'s Sur Reply at 3-4 (citing D.C. Code §§1-601.02, 1-608.01 (2013); D.C. Mun. Regs. tit. 6, §802 (2013)). Therefore, Johnson has not shown that there was a departure from "established procedures" because publicly posting jobs does not appear to be required, and he provides no evidence that the District failed to foster "open competition." Rather, the record indicates that the District's hiring of Reyes to fill the Operating Accountant position satisfied "open competition" because she applied and interviewed twice for the position before being selected. See Reyes Dep. 22:2-22:10. And, even assuming that the District had departed from an established procedure by not publicly posting positions, no reasonable jury could find that the alleged departure establishes pretext for sex discrimination in light of Johnson's own assertion that Max Fano, a male, was hired into one of these positions that was not publicly posted.[15] See Opp'n at 20.

---

[15] Although an "employer's failure to follow established procedures or criteria" may undermine the credibility of its asserted non-discriminatory reasons, Francis v. District of Columbia, 731 F. Supp. 2d 56, 72 (D.D.C. 2010) (quoting Brady, 520 F.3d at 495 n.3), "[a]n employer's failure 'to follow its own regulations and procedures, alone, may not be sufficient to support' the conclusion that its explanation for the challenged employment action is pretextual," Fischbach v. D.C. Dep't of Corrs., 86 F.3d 1180, 1183 (quoting Johnson v. Lehman, 679 F.2d 918, 922 (D.C. Cir. 1982)).

Johnson also claims that the District's allegedly merit-based pay system was a pretext for discrimination because Reyes was paid more than he was. Opp'n 18-19. The Court finds no merit in this argument because Reyes and Johnson did not even hold the same positions, see supra Section I, and because the record does not demonstrate that Johnson was significantly more qualified than Reyes. As an initial note, "Title VII is not a statutory invitation for the judiciary to micromanage all personnel decisions." Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999). Therefore, although a plaintiff may demonstrate evidence of a pretext where there is a gap between the relative qualifications of the plaintiff and the individual who was paid more, "[t]his evidence is only probative . . . if the gap is so wide and inexplicable that it inherently gives rise to an inference of discrimination." Bolden v. Clinton, 847 F. Supp. 2d 28, 36 (D.D.C. 2012) (internal quotations omitted); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc) (discrimination can be inferred if fact finder can conclude that plaintiff was "significantly better qualified"); Stewart v. Ashcroft, 352 F.3d 422, 429-30 (D.C. Cir. 2003) (there must be evidence of "stark superiority of credentials" because "differences in qualifications" that merely indicate a "close call" do not get [plaintiff] beyond summary judgment").

Hence, Johnson must show not merely that he was more qualified than Reyes, but that he was significantly better qualified. He has not done so. The District offers Reyes' credentials and job history to demonstrate that she was at least as qualified as he was. In particular, at the time that Reyes worked as a member of the OFOS task force, she had a bachelor's degree in business administration with the requisite hours of accounting and over fourteen years of prior accounting experience, as well as relevant experience in the specialized area of the SOARS accounting system. See P. & A. in Supp. of Summ. J. at 9-12, 26-27. By comparison, Johnson had an associate's degree in science with some accounting coursework and about twenty years of

accounting experience, but did not have specialized SOAR experience.  See Pl.'s Ex. 10 (Johnson's Resume) at 4; Johnson Dep. at 12:18-19, 13: 9-16.  Bearing in mind that in order to demonstrate evidence of a pretext, a gap in qualifications must be so "wide and inexplicable that it inherently gives rise to an inference of discrimination," Bolden, 847 F. Supp. 2d at 36, the Court finds that the record does not reflect that Johnson was significantly better qualified than Reyes.  Moreover, there is nothing in the record that contradicts the District's explanation that Reyes was paid more because she "attained a higher level of education," "had greater breadth and depth of accounting and financial experience," and "possessed crucial expertise in SOAR at a time when such expertise was vitally needed."  See P. & A. in Supp. of Summ. J. at 27.

Lastly, Johnson argues that the District's explanation that factors other than sex were the cause of any pay disparity is pretextual because he received less money than female employees according to his loss calculation report.  See Opp'n at 18; Edelman Report.  However, although "statistics may be used in Title VII cases to illustrate a history of discrimination or to show that the defendant's professed reasons for acting are merely a subterfuge," the mere presentation of the various salaries of certain male and female employees is insufficient, without more, to support an inference of discrimination.  Bolden, 847 F. Supp. 2d at 35; see also Cook v. Boorstin, 763 F.2d 1462, 1468 (D.C. Cir. 1985).  Rather, a plaintiff "must demonstrate that all of the relevant aspects of their employment situation are nearly identical."  Adair v. Solis, 742 F. Supp. 2d 40, 53 n.12 (D.D.C. 2012).  As previously discussed, Johnson fails to do this. Accordingly, Johnson failed to produce evidence sufficient to satisfy his "burden of showing that a reasonable juror could conclude" that the District's alleged delay and denial of a salary increase was because of his gender, see Aka, 156 F.3d at 1290, and his claims of gender discrimination under Title VII cannot survive summary judgment.

### III.    Disability Discrimination

The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), and the Rehabilitation Act, 29 U.S.C. § 794(a), provide disabled individuals with essentially identical protections against employment discrimination. Harrison v. Rubin, 174 F.3d 249, 253 (D.C. Cir. 1999). Given the coextensive scope of their coverage, claims of employment discrimination under these statutes generally can be scrutinized together, see Barnes v. Gorman, 536 U.S. 181, 184-85 (2002), and this Court will do so here.

To establish a prima face violation of the ADA or the Rehabilitation Act, a plaintiff must show by a preponderance of the evidence that he: (1) is disabled within the meaning of the statute; (2) was qualified for the position with or without a reasonable accommodation; and (3) suffered an adverse employment action because of his disability. Duncan v. Wash. Metro. Area Transit Auth., 240 F.3d 1110, 1114 (D.C. Cir. 2001) (en banc) (internal citations omitted). However, similar to Title VII claims, if there is an adverse employment action and the defendant has proffered legitimate, nondiscriminatory reasons for its actions, the Court should bypass the prima facie case and examine whether the employee has produced sufficient evidence for a reasonable jury to find that the employer's proffered reasons were pretextual. Kersey v. Wash. Metro. Area Transit Auth., 586 F.3d 13, 16-17 (D.C. Cir. 2009).

Johnson argues that he was discriminated against based on his actual or perceived disabilities (blindness in one eye and insulin-dependent diabetes) when the District delayed and denied providing him with an allegedly promised pay raise.[16] As discussed previously, the District's delay and denial of the allegedly promised pay raise arguably rises to the level of an adverse employment action. But, as was true for Johnson's Title VII claim, the Court need not

---

[16] The additional adverse employment actions alleged under Title VII that were dismissed by the Court, see supra Section II(A) n.11, were also alleged under the ADA and the Rehabilitation Act. However, for the same reason that those actions were dismissed by the Court in the context of Johnson's Title VII claims, they will be here. See id.

resolve this issue here because Johnson is unable to establish that the District's proffered non-discriminatory reason is pretext.

The District urges, as it did in response to the Title VII claim, that Johnson was not given a pay raise because his work did not merit it, as demonstrated by the desk audit.  The Court has already determined that there is no evidentiary basis to call into question the desk audit's accuracy or suggest that it was tainted with discriminatory intent.

The District further contends that, if there is any pay disparity between Johnson and other non-disabled employees, such a disparity would result from "defendant's seniority system, legitimate merit system, system which measures earnings by quantity or quality of production and/or factors other than … disability."  See Am. Ans.; P. & A. in Supp. of Summ. J. at 2.  In response, Johnson offers several arguments in an attempt to show a causal connection between the delay and denial of the pay raise and his disability.  His arguments center on his belief that Gaines could have given him a pay raise,[17] but chose not to do so because she discriminated against him because of his disability.

As putative proof of animus, Johnson first alleges that Gaines inquired about his habit of sleeping at his desk, something that apparently results from his diabetes and typically happens after lunch.  Opp'n at 22; Johnson Dep. at 102:7-22.  Gaines testified that she "noticed that [Johnson] was falling asleep quite a bit in the afternoons[,]" so she asked his supervisor, Dukes, if he knew that Johnson "was falling asleep on the job."  Gaines Dep. at 27:1-7.  Dukes then told Gaines that Johnson "was on medication."  Id. at 27:8-9.  A supervisor asking questions about an

---

[17] Specifically, Johnson alleges that, in February 2003, "Gaines refused to [sign] the Personnel Action changing [Johnson] to a Grade 6 and increasing his salary."  Pl.'s Stmt. of Material Facts, ¶ 49.  However, the documentary evidence does not support this argument.  The personnel action form, which purports to request a grade change for Johnson, appears to be only partially completed, contains only the typed names of Alexander and Cabbell in a box that calls for the requestors' signatures, and bears no indication of its validity.  See Pl.'s Ex. 12 (Request for Personnel Action Form) [Dkt. 75] at 4-5.  Also, there are no signatures on the form, and when Cabbell was shown the form, he testified that he did not recall seeing it before or understand "in what capacity [his] name is typed in there."  Cabbell Dep. 18:1-19:6.  Furthermore, Johnson had the opportunity to depose Gaines, but offers no excerpt of that testimony, let alone testimony regarding this alleged personal action form.

employee who is sleeping at work is not, on its face, a suspicious action, and Johnson provides no evidence of discriminatory animus behind the inquiry, or any causal connection between the inquiry and the decision not to raise his pay.  He even admits that merely inquiring into his drowsiness is not proof of discrimination – he acknowledged that a former supervisor who inquired about his sleeping habit likely did so "because it's sort of embarrassing to a person, you know, if [an employee is] sitting up there asleep, the president might walk through, you know, and then, you know, [the supervisor] might be or [the employee] might be or anybody might be – writ[ten] up for it."  Johnson Dep. 104:14-21.  Likewise, there are legitimate reasons for Gaines to have asked about Johnson's habit of falling asleep at his desk that simply have nothing to do with discrimination.

Johnson also argues that Gaines complained that he was a slow worker, and this complaint was indicative of discriminatory animus because Johnson asserts that any slowness on his part "was caused by his eyesight [because he is blind in one eye]."  Opp'n at 14, 15.  However, even after considering all possible inferences that can be drawn from this alleged complaint in a light most favorable to Johnson, there is nothing about it that demonstrates discrimination based on disability or any connection between it and the decision not to raise Johnson's pay.  Gaines's alleged complaint merely reflects the justifiable concerns of a supervisor in the workplace.

In short, neither of the incidents described by Johnson rebuts the District's explanation that it delayed or denied his raise for the simple reason that it was not merited, as demonstrated by the desk audit.  Accordingly, there is insufficient evidence in the record to call into question the District's proffered non-discriminatory reason for not raising Johnson's pay, and no reasonable juror could conclude that the District acted because of Johnson's diabetes or partial blindness.  The ADA and Rehabilitation Act claims, then, cannot survive summary judgment.

## VI.    Retaliation

Title VII, the ADA, and the Rehabilitation Act prohibit an employer from retaliating against an employee who files a discrimination charge or engages in certain other protected conduct.  See Ginger v. District of Columbia, 527 F.3d 1340, 1346 (D.C. Cir. 2008); Smith v. District of Columbia, 430 F.3d 450, 454-55 (D.C. Cir. 2005); Duncan v. Wash. Metro. Area Transit Auth., 214 F.R.D. 43, 49 (D.D.C. 2005).   Here, Johnson claims that he suffered retaliation when Gaines, the Controller at UDC and one of his supervisors, allegedly refused to assist him with his pay raise matter.[18]  Specifically, he alleges that, at some point in 2005 prior to his filing of an EEOC charge, Johnson told Gaines "about the fact that [a form] [he] received . . . after the Desk Audit . . . changed only [his] title but not [his] pay and grade," to which Gaines allegedly responded that "she would no longer help [Johnson] because [he] had an attorney and [he] was 'in legal.'"[19]  Pl.'s Ex. 1 (Jun. 6, 2011 Johnson Aff.) ¶ 29.

To establish a claim for retaliation, a plaintiff must demonstrate that: (1) he engaged in a statutorily protected activity; (2) the employer took adverse personnel action; and (3) a causal connection existed between the two.  Morgan v. Fed. Home Loan Mortg. Corp, 328 F.3d 647, 651 (D.C. Cir. 2003) (stating the legal standard for retaliation claim under Title VII); Jones v. Wash. Metro. Area Transit Auth., 205 F.3d 428, 433 (D.C. Cir. 2000) (stating that the legal standard for retaliation claim under the ADA is the same as that for claims under Title VII); Norden v. Samper, 503 F. Supp. 2d 130, 156 (D.D.C. 2007) (stating that the legal standard for retaliation claim under the Rehabilitation Act is the same as that for claims under Title VII).  Similar to a discrimination claim, when a retaliation claim is "based upon circumstantial

---

[18] The parties agree that Johnson engaged in protected activities when he sent the 2004 letter to Dukes and when he retained a lawyer to assist him with his claims.  See P. & A. in Supp. of Summ. J. at 61; 2d Am. Compl ¶ 25.

[19] Johnson also asserts that he suffered retaliation in the form of a diminution in job duties, exclusion of closeout assignments, and denial of incentive awards.  Opp'n at 13, 20.  However, these claims were previously dismissed as time-barred, see Aug. 21, 2008 Mem. Op. at 11, 17 n.7, and were not reinstated, see Jul. 14, 2009 Mem. Op. at 4.

evidence, we analyze it under the burden-shifting framework set out in McDonnell Douglas."
Kersey, 586 F.3d at 16-17, 17 n.2.  However, the D.C. Circuit has explained that the principles
that led it in Brady to call McDonnell Douglas a "sideshow" in the discrimination context,
"apply equally to retaliation claims."  Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009)
(quoting Brady, 520 F.3d at 494) (internal quotation marks omitted).  Therefore, when there is an
adverse action and "defendant proffers a [] nonretaliatory rationale … the plaintiff must show
that a reasonable jury could conclude from all of the evidence" that defendant's rationale is a
pretext.  Kersey, 586 F.3d at 16-17.  This Court will, therefore, begin its analysis with an
examination of whether there was an adverse action.

In the retaliation context, the term "adverse action" "encompass[es] a broader sweep of
actions than those in a pure discrimination claim."  Baloch v. Kempthorne, 550 F.3d 1191, 1198
n. 4 (D.C. Cir. 2008).  Thus, retaliation claims are "not limited to discriminatory actions that
affect the terms and conditions of employment" and may extend to harms that are not workplace-
related or employment-related.  Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548
U.S. 53, 64, 68 (2006)).  Nonetheless, "the employer's actions must be harmful to the point that
they could well dissuade a reasonable worker from making or supporting a charge of
discrimination."  Burlington, 548 U.S. at 57; see also Pardo-Kroneman v. Donovan, 601 F.3d
599, 607 (D.C. Cir. 2010).

Johnson contends that he suffered an adverse action because Gaines refused to assist him
with his pay raise matter when he complained to her that a form from his desk audit did not
provide him with a raise.[20]  Pl.'s Ex. 1 (Jun. 6, 2011 Johnson Aff.) ¶ 29.  The District responds

---

[20] In his opposition, Johnson adds a new claim that Gaines initiated the desk audit as a form of retaliatory adverse
action against him because "he had complained," but he also states, in the same paragraph, that "Gaines did not
initiate a desk audit on her own initiative."  Opp'n at 6.  Thus, it appears that Johnson is, on one hand, contending
that Gaines initiated a desk audit to retaliate against him for his complaints, but on the other hand, arguing that

that Gaines's "alleged refusal to assist Johnson was a single, isolated, unadorned comment that appears less a threat than an expression of exasperation." P. & A. in Supp. of Summ. J. at 63. The District analogizes the statement to one made in Gaujacq v. EDF, Inc., 601 F.3d 565 (D.C. Cir. 2010), where the Court found that a threatening verbal statement alone "is not necessarily a materially adverse action; employer's words and other actions must be considered in context to determine whether they would dissuade a reasonable worker from filing a claim and thus result in actionable retaliation." 601 F.3d at 578 (citing Burlington, 548 U.S. at 57).

In Gaujacq, the alleged adverse action was a superior's statement to an employee that "[y]our career is dead" at the company "if you file the claim" of discrimination. Id. The Court decided that a reasonable worker in the employee's position would not have taken the supervisor's "brief, fleeting, and unadorned verbal statement as an act or threat of retaliation," where company officials "went out of their way to accommodate [the employee's] desire to stay in the United States, despite her increasing insubordination and refusal to consider any future employment decision that did not meet her precise demands." Id. The District argues here that, similarly, Gaines's statement cannot be considered adverse where the District had responded to Johnson's pay concerns by requesting the desk audit, yet he "continued to raise the matter, angrily and at inappropriate times," and the District had tried to offer him positions of advancement, but he refused to consider them. P. & A. in Supp. of Summ. J. at 44, 62.

Although there are some similarities between Gaujacq and this case, the Court finds that because Gaines's statement was not a direct threat it does not rise to the level of the statement at issue in Gaujacq. On its face, Gaines's statement does not represent an attempt to intimidate Johnson or interfere with his discrimination claim; more fairly, it was just a statement that she was unable to help him. Interpreted most favorably to Johnson, the potential adverse action here

---

Gaines did not initiate the audit on her own motivation. Regardless, this claim is time-barred because the desk audit occurred in 2004. See Aug. 21, 2008 Mem. Op. at 11; Jul. 14, 2009 Mem. Op. at 4.

is Gaines's refusal to assist him with his pay issue.  However, the record shows Johnson was paid commensurate with his duties and, as a result, Gaines's refusal to help him with his claim for a higher salary did not eliminate or otherwise affect some benefit or opportunity to which Johnson was entitled.  It cannot be an actionable adverse action for a supervisor to decline to assist an employee with a claim that the employer has already rejected and that the employee has acquired legal help to explore.

Simply put, the alleged adverse action here rests on Johnson's unsubstantiated personal belief, supported only by his testimony and self-serving affidavit, that he should be paid more than the desk audit determined he should be paid.  This is insufficient.  See Sykes v. Napolitano, 710 F. Supp. 2d 133, 144 (D.D.C. 2010) (an employee's "subjective belief … is insufficient to demonstrate that the [challenged employment action] was an adverse action").  To resist summary judgment, Johnson must put forward competent evidence in support of his claims, and he has failed to discharge that burden here.

Previously, the Court observed that a refusal to assist in a pay raise matter could be an adverse employment action.  See Aug. 21, 2008 Mem. Op. [Dkt. 26] at 22.  Despite extensive discovery, Johnson has offered no evidence to demonstrate that Gaines's refusal resulted in any cognizable harm to him.  Therefore, Johnson has failed to show that a reasonable employee would be dissuaded from making or supporting a charge of discrimination under these circumstances.  Johnson has not presented evidence that would allow a reasonable fact finder to conclude that Gaines's statement constituted an adverse action.  His retaliation claim, then, does not survive summary judgment.

## **CONCLUSION**

For the reasons set forth above, the District's motion for summary judgment will be granted. A separate Order has been issued on this date.


                                          _____/s/_____
                                                          JOHN D. BATES
                                                  United States District Judge

Dated:  June 5, 2013